STATE Of RHODE ISLAND; Bruce Sundlun, in his capacity as Governor of the State of Rhode Island; Jeffrey B. Pine, in his capacity as Attorney General of the State of Rhode Island; Town of Charlestown, Daniel J. Shanley, Jr., Carol M. Miller, Richard J. Halchak, J. Michael Downey and Evelyn Smith, in their capacities as Members of the Charlestown Town Council, Petitioners,

v.

NARRAGANSETT TRIBE OF INDIANS, George V. Hopkins, in his capacity as Chief Sachem and Anthony Dean Stanton, in his capacity as First Councilman, Respondents.

Civ. A. No. 92–0425–P.

United States District Court, D. Rhode Island.

March 4, 1993.

Ellen Evans Alexander, Alan M. Shoer, Christine S. Jabour, R.I. Atty. Gen.'s Office, Providence, RI, for plaintiffs State of R.I. and Atty. Gen.

Betsey Myers, Providence, RI, for plaintiff Governor of R.I.

James J. Mullen, Barrington, RI, for plaintiffs Town of Charlestown, Shanley, Miller, Halchak, Downey and Smith.

John F. Killoy, Wakefield, RI, Charles A. Hobbs, Washington, DC, for defendants.

W. Mark Russo, Adler, Pollock & Sheehan, Providence, RI, for amicus.

### MEMORANDUM AND ORDER

PETTINE, Senior District Judge.

In 1988, Congress passed sweeping new legislation, the Indian Gaming Regulatory Act ("the Gaming Act"), 25 U.S.C. §§ 2701–2721 and 18 U.S.C. §§ 1166–1168, "to provide a statutory basis for the operation of gaming by Indian tribes as a means of promoting tribal economic development, self-sufficiency, and strong tribal governments." 25 U.S.C.

§ 2702(1). The Gaming Act provides a comprehensive framework for the regulation of gambling on indian lands.

This declaratory judgment action arises from a dispute over the applicability of the Gaming Act to lands owned by the Narragansett Tribe of Indians ("the Tribe") in Charlestown, Rhode Island. In short, the parties dispute: (1) whether the Gaming Act is applicable to the Tribe's "settlement lands" in Charlestown; and (2) whether, and to what extent, the State of Rhode Island and the Town of Charlestown may exercise civil regulatory jurisdiction over the settlement lands, including jurisdiction over gaming activities.

For the reasons discussed below, I hold that the Gaming Act is applicable to the Tribe's settlement lands. I also hold that no justiciable controversy exists between the parties as to the general applicability of state and local jurisdiction over the settlement lands.

## I.

The Gaming Act establishes three classes of Indian gaming activity, each subject to different levels of federal, state and tribal jurisdiction. Before an Indian Tribe may establish "Class III" gaming—or most high stakes games of chance—on their lands, the Gaming Act requires the completion of a Tribal–State compact. § 2710(d)(1)(C). The Gaming Act specifies that upon receiving a request from a Tribe to negotiate a Class III gaming compact, a State must negotiate in "good faith." § 2710(d)(3)(A). If the State fails to negotiate, or does not negotiate in good faith, an Indian Tribe may initiate a cause of action in U.S. district court 180 days after an Indian Tribe's request. § 2710(d)(7)(A)(i) and (B)(i).[1]

On July 15, 1992, the Narragansett Tribe served the Governor of Rhode Island with a letter requesting the State to enter negotiations to form a Class III compact to govern gambling on the Tribe's settlement lands. Shortly thereafter, petitioners filed this action for declaratory and injunctive relief under 28 U.S.C. § 1331 and the Declaratory Judgment Act, 28 U.S.C. §§ 2201 and 2202. Specifically, petitioners request that this Court declare that: (1) the Gaming Act does not apply to the settlement lands; and (2) that those lands are subject to the criminal, civil, and civil regulatory laws of Rhode Island and the Town of Charlestown, including criminal and civil laws regulating gambling. Petitioners also ask this Court to preliminarily enjoin the Tribe from taking any action to develop or use the settlement lands not in compliance with State or local laws, and to issue an order enjoining the State and the Tribe from negotiating a Tribal–State compact under the Gaming Act.

The driving force behind this suit is petitioners' contention that the Narragansett Tribe consented to state and local jurisdiction, including civil regulatory jurisdiction, over the settlement lands as part of a 1978 Joint Memorandum of Understanding ("JMOU") entered into by the State, the Town of Charlestown, the Tribe and private parties. Under the JMOU, the Narragansett Tribe was provided with approximately 1800 acres of settlement land in exchange for the Tribe's relinquishment of its legal claims to 3200 acres of aboriginal lands in Rhode Island. As petitioners note, the jurisdictional provisions of the JMOU were implemented by the United States Congress in the Rhode Island Indian Claims Settlement Act ("Settlement Act"), 25 U.S.C. §§ 1701–1716, and by the Rhode Island Legislature in the Narragansett Indian Land Management Corporations Act, as amended, R.I.G.L. §§ 37–18–1—37–18–15.[2] Among other things, § 1708 of the federal Settlement Act declares that "the settlement lands shall be subject to the

---

**1.** If the district court finds that the State has failed to negotiate in good faith with the Tribe, the court shall order the State and Tribe to conclude a compact within 60 days. If negotiations fail during the 60–day period, each side shall submit their last best offer to a court-appointed mediator. § 2710(d)(7)(B)(iii) and (iv).

**2.** The history of the settlement agreement and the acquisition of the lands is summarized in *Town of Charlestown v. United States*, 696 F.Supp. 800, 801–03 (D.R.I.1988), *aff'd without opinion*, 873 F.2d 1433 (1st Cir.1989).

civil and criminal laws and jurisdiction of the State of Rhode Island." [3]

According to petitioners, when Congress enacted the 1988 Gaming Act, some 10 years later, it did not intend to preempt the complete jurisdictional grant allocated to the State of Rhode Island in the 1978 Settlement Act. Rather, Congress sought to ensure that the settlement lands in Charlestown remained subject to all criminal, civil and civil regulatory laws of Rhode Island, including laws regulating gambling.

While there is no language in the Gaming Act itself that would exclude the Narragansett Tribe or the settlement lands from its coverage, petitioners point to legislative history that they believe demonstrates Congress' desire not to supersede Rhode Island's jurisdictional authority as stated in the 1978 Settlement Act. In a related argument, petitioners contend that because the Settlement Act is a more specific articulation of jurisdiction over the settlement lands, the more general provisions of the Gaming Act cannot alter the Tribe's prior agreement to be bound by State and local law, or the Settlement Act's implementation of that agreement. Finally, petitioners argue that the Tribe does not "exercise governmental powers" or possess "jurisdiction" over the settlement lands, as required by the Gaming Act. For all these reasons, petitioners contend that the Gaming Act is inapplicable to the settlement lands.

In opposition, the Tribe seeks a declaration from the Court that: (1) the settlement lands are not subject to the State's civil regulatory laws; (2) the Tribe is entitled to operate a Class III casino on their lands in conformance with the Gaming Act; and (3) the Tribe is entitled to have the State negotiate in good faith toward a Class III compact. The Tribe also requests this Court to issue a preliminary injunction ordering the State to enter into "good faith" negotiations. Both parties have moved for summary judgment.[4]

By agreement of all parties, this Court entered an order on October 6, 1992, staying the commencement of the 180-day negotiating period for the purpose of entering into a Tribal–State compact until a final written decision on the merits was entered.

## II.

The Declaratory Judgment Act states that where there is "a case of actual controversy," a federal court "may declare the rights and other legal relations of any interested party seeking such declaration, whether or not further relief is or could be sought." 28 U.S.C. § 2201. There are no clear-cut criteria to determine the presence of an actual controversy. The frequently cited standard is contained in *Maryland Casualty Co. v. Pacific Coal & Oil Co.*, 312 U.S. 270, 273, 61 S.Ct. 510, 512, 85 L.Ed. 826 (1941): "Basically, the question in each case is whether the facts alleged, under all the circumstances, show that there is a substantial controversy, between parties having adverse legal interests, of sufficient immediacy and reality to warrant the issuance of a declaratory judgment." According to petitioners, an actual controversy satisfying this test exists between the State, the Town of Charlestown and the Tribe concerning jurisdiction over the settlement lands, and the applicability of the Gaming Act to those lands. The respondents do not challenge the jurisdiction of this Court.

---

**3.** Although not relevant to the outcome of this case, the original JMOU states, in part:

> 13. That, except as otherwise specified in this Memorandum, all laws of the State of Rhode Island shall be in full force and effect on the Settlement Lands, including but not limited to state and local building, fire and safety codes.

The Narragansett Indian Land Management Corporation Act, as amended, states, in part:

37–18–11. Civil and criminal jurisdiction.—Except as otherwise provided, the [land management] corporation and all its authorized activities shall be subject to all criminal and civil laws of the state and the town.

37–18–13. Transfer of land to Indian tribe.—... All real property transferred by the Narragansett Indian land management corporation to the federally recognized Narragansett Tribe of Indians pursuant to this provision:

\* \* \* \* \* \*

(b) Shall be subject to the civil and criminal laws of the state of Rhode Island and the town of Charlestown, Rhode Island, except as otherwise provided herein.

**4.** On November 18, 1992, the parties submitted a joint statement of undisputed facts for purposes of resolving this suit on summary judgment. All other motions are considered passed.

■ I believe there is an actual controversy in this suit, although it is narrower than that framed by petitioners. The Tribe has transmitted a letter to the State requesting the commencement of Tribal–State compact negotiations. Under the Gaming Act, the State is obligated to enter into good faith negotiations with the Tribe after receiving this request. § 2710(d)(3)(A). Thus, the State is confronted with the choice of either negotiating a Tribal–State compact that it does not believe it must complete, or almost certainly facing a lawsuit by the Tribe after 180 days for failing to negotiate. To be sure, the Gaming Act does not provide an express jurisdictional basis for this action at this juncture. But I see no reason for the parties to remain idle for six months before resolving whether the Gaming Act applies to the settlement lands. This issue presents a justiciable controversy. Moreover, as noted above, the parties have consented to my stay of the commencement of the 180 day negotiating period. Obviously, the state is refusing to negotiate for the reasons I have recited—they are at an impasse, the controversy has matured, and there is no need to delay its adjudication. *See Spokane Indian Tribe v. United States*, 972 F.2d 1090, 1091–92 (9th Cir.1992) (where parties failed to conclude Tribal–State compact because of disagreement over classification of "Pick Six Lotto" under Gaming Act, actual controversy existed under Declaratory Judgment Act); *Oneida Tribe of Indians v. Wisconsin*, 951 F.2d 757, 759–60 (7th Cir.1991) (actual controversy existed under Declaratory Judgment Act where Tribal–State compact negotiations were at an impasse over meaning of the term "lotto" in the Gaming Act).

■ Despite this holding, I do not find that an actual controversy exists concerning state and local jurisdiction over the settlement lands, in general. As noted above, the Tribe claims that the settlement lands are not subject to the State's civil regulatory laws. In contrast, petitioners assert that the settlement lands are subject to all of the State's and Town's laws, including civil regulatory laws. Thus, it is petitioners' position "that any use and development of the lands must proceed in accordance with applicable State and local laws." Memorandum Of Law

In Support Of Petitioners' Motion For Declaratory Judgment And Injunctive Relief at 6. "This dispute," petitioners argue, "has created a cloud over any future development of the Settlement Lands (including the proposed casino gambling facility) that threatens, by its very nature, to embroil the parties in litigation." *Id.* "By deciding this issue now, the Court can reduce the prospect of future litigation by defining the parameters of State and local jurisdiction over the Settlement Lands." *Id.* at 7.

With all due respect, this abstract disagreement over the applicability of state and local laws on the settlement lands does not translate into an actual controversy. Petitioners do not allege that the Tribe is actually using or developing the settlement lands in violation of specific state or local laws. At this stage, the Tribe has simply sent a letter to the State requesting negotiations under the Gaming Act to enter into a compact. It would be premature for this Court to analyze the jurisdiction of the State and Town over the settlement lands based upon hypothetical conflicts in the future.

In sum, I conclude that there is jurisdiction with respect to the applicability of the Gaming Act to the settlement lands. All other issues raised by the parties are not ripe for decision at this time.

### III.

### A.

The Gaming Act boldly declares in its congressional findings that: "Indian tribes have the exclusive right to regulate gaming activities on Indian lands if the gaming activity is not specifically prohibited by Federal law and is conducted within a State which does not, as a matter of criminal law and public policy, prohibit such gaming activity." § 2701(5). The three separate categories of gambling under the Gaming Act are defined as follows.

Class I gaming consists of social games for minimal prizes or traditional games related to tribal ceremonies or celebrations. 25 U.S.C. § 2703(6). Under the Act, Class I

gaming is within the exclusive jurisdiction of Indian tribes. § 2710(a)(1).

Class II gaming includes bingo and related games, as well as certain nonbanking card games. § 2703(7)(A). Banking card games (including blackjack), electronic games of chance, and slot machines are expressly excluded from Class II. § 2703(7)(B). Class II gaming is within the jurisdiction of the Indian Tribe, but is generally subject to oversight by the National Indian Gaming Commission. §§ 2710(a)(2), 2710(b) and (c).

Class III gaming comprises all forms of gambling not covered by Class I or Class II. Section 2710(d)(1) states that Class III gaming shall be lawful on "Indian lands" only if such activities are:

> (A) authorized by an ordinance or resolution that—
>> (i) is adopted by the governing body of the Indian tribe having jurisdiction over such lands,
>> (ii) meets the requirements of subsection (b) of this section, and
>> (iii) is approved by the Chairman [of the National Indian Gaming Commission],
> (B) located in a State that permits such gaming for any purpose by any person, organization, or entity, and
> (C) conducted in conformance with a Tribal–State compact entered into by the Indian tribe and the State under paragraph (3) that is in effect.

The principal component of the Class III framework is the Tribal–State compact. The Gaming Act contemplates that the compact may include provisions allocating "criminal and civil jurisdiction between the State and the Indian tribe necessary for the enforcement of [State and tribal] laws and regulations" related to, and necessary for, the regulation of gambling. §§ 2710(d)(3)(C)(i) and (ii).

█ Several courts that have construed the Gaming Act have held that it preempts earlier federal laws giving states jurisdiction over Indian lands. *United Keetoowah Band of Cherokee Indians v. Oklahoma*, 927 F.2d 1170 (10th Cir.1991); *Sycuan Band of Mis-*

*sion Indians v. Roache*, 788 F.Supp. 1498 (S.D.Cal 1992); *Lac du Flambeau Band of Lake Superior Chippewa Indians v. Wisconsin*, 743 F.Supp. 645 (W.D.Wis.1990) [5]. These cases indicate that even where states may have had criminal or civil jurisdiction over gaming activities on Indian lands, the Gaming Act has preempted that jurisdiction.

In *Sycuan Band of Mission Indians, supra*, a district court considered the interplay between the Gaming Act and the authority of Californian authorities to criminally prosecute violations of state gaming laws on Indian lands under 18 U.S.C. § 1162 (Public Law 280), a federal statute that granted six states limited jurisdiction over Indian lands. The district court determined that even if § 1162 had granted the state jurisdiction over gaming activities, the Gaming Act "preempted" state authority under § 1162 in the field of gaming. *Id.* at 1503–04. The Court stated that even under the stringent repeal-by-implication analysis, the Gaming Act "governs the enforcement of state gaming laws and prohibits the enforcement of these laws in the absence of a tribal-state compact." *Id.* at 1504. The court added:

> ... [the Gaming Act] creates a comprehensive jurisdictional framework for the regulation of gaming activities on Indian lands. The regulation of gaming by states outside the framework of the [Gaming Act] would frustrate this framework and Congress's careful balancing of the competing interests involved in Indian gaming.

*Id.* Similarly, in *Lac du Flambeau Band of Lake Superior Chippewa Indians, supra*, the court concluded that the Gaming Act "preempted" Wisconsin officials "from exercising criminal jurisdiction [under 18 U.S.C. § 1162] over gaming activities on [Indian] reservations in the absence of a tribal-state compact that confers such authority on the state by agreement." 743 F.Supp. at 652.

In *United Keetoowah Band of Cherokee Indians, supra*, the Tenth Circuit found that the Gaming Act "circumscribed" application of Oklahoma laws relating to gaming under the federal Assimilative Crimes Act, 18

---

**5.** Later proceedings of this case can be found at 770 F.Supp. 480 (W.D.Wis.1991), *appeal dis-* *missed*, 957 F.2d 515 (7th Cir.), *cert. denied*, — U.S. ——, 113 S.Ct. 91, 121 L.Ed.2d 53 (1992).

U.S.C. § 13.[6] 927 F.2d at 1180–81. The Court stated "the very structure of the [Gaming Act] permits assertion of state civil or criminal jurisdiction over Indian gaming *only* when a tribal-state compact has been reached to regulate class III gaming." *Id.* at 1177 (emphasis in original). These cases confirm that the Tribal–State compact process is the exclusive vehicle for state jurisdiction over Class III gaming activities under § 2710(d)(1) of the Gaming Act.[7]

### B.

Petitioners concede that Congress intended to "preempt the field regarding gaming activities on Indian lands throughout the country" when it enacted the Gaming Act. Memorandum of Law In Support Of Petitioners' Motion For Declaratory Judgment and Injunctive Relief at 10. But they argue that "Congress did not intend, through enactment of the Gaming Act, to preempt the jurisdiction of the State of Rhode Island over the Settlement Lands that it expressly conferred on the State in 1978 through enactment of the federal Settlement Act." *Id.*

In support of their argument, petitioners quote from the Senate Select Committee report on Senate bill 555—the bill that ultimately became the Gaming Act:

> ... it is the intention of the Committee that *nothing* in the provision of this section or *in this act will supersede any specific*

restriction or specific grant of Federal authority or jurisdiction to a State which may be encompassed in another Federal statute, including the *Rhode Island Claims Settlement Act* (Act of September 30, 1978, 92 Stat. 813; P.L. 95–395) and the Marine [sic; *read Maine* ] Indian Claims Settlement Act (Act of October 10, 1980; 94 Stat. 1785; P.L. 96–420).

S.Rep. No. 446, 100th Cong., 2d Sess. 12 (1988), *reprinted in* 1988 U.S.C.C.A.N. 3071, 3082 (emphasis added). In addition, petitioners note the following colloquy on the floor of the Senate when the Gaming Act was considered[8]:

> Mr. PELL. Mr. President, I would like to thank the managers of S.555, the Indian Gaming Regulatory Act, and particularly the chairman of the Select Committee on Indian Affairs [Mr. Inouye], for their hard work and patience in achieving a consensus on this important measure.
>
> *In the interests of clarity, I have asked that language specifically citing the protections of the Rhode Island Claims Settlement Act (Public Law 95–395) be stricken from S. 555. I understand that these protections clearly will remain in effect.*
>
> Mr. INOUYE. I thank my colleague, the senior Senator from Rhode Island [Mr. Pell], and *assure him that the protections of the Rhode Island Claims Settlement Act (P.L. 95–395), will remain in effect and*

6. The Assimilative Crimes Act reads in relevant part:

> (a) Whoever within or upon any [federal enclave] ..., is guilty of any act or omission which, although not made punishable by any enactment of Congress, would be punishable if committed or omitted within the jurisdiction of the State ... in which such place is situated, by the laws thereof in force at the time of such act or omission, shall be guilty of a like offense and subject to a like punishment. 18 U.S.C. § 13(a).

7. The legislative history supports the proposition that states may exercise jurisdiction over such Class III gaming only through the Tribal–State compact process:

> ... unless a tribe affirmatively elects to have State laws and State jurisdiction extend to tribal lands, the Congress will not unitaterally (sic) impose or allow State jurisdiction on Indian lands for the regulation of gaming activities.

The mechanism for facilitating the unusal (sic) relationship in which a tribe might affirmatively seek the extension of State jurisdiction and the application of state laws to activities conducted on Indian land is a tribal-State compact....

> \* \* \* \* \* \*

S.555 is intended to expressly preempt the field in the governance of gaming activities on Indian lands. Consequently, Federal courts should not balance competing Federal, State and tribal interests to determine the extent to which various gaming activities are allowed. S.Rep. 446, *supra*, at 5–6, *reprinted in* 1988 U.S.C.C.A.N. at 3075–76.

8. To alert the reader to the significance of the colloquy, a draft of the Gaming Act originally contained a Section 23, as will be discussed *infra*, specifically prohibiting gambling on the Tribe's lands "except to the extent permitted" by the State of Rhode Island. It is this section that the Senators presumably asked to be stricken.

*that the Narragansett Indian Tribe clearly will remain subject to the civil, criminal, and regulatory laws of the State of Rhode Island.*

Mr. CHAFEE. Mr. President, I too would like to thank the chairman [Mr. Inouye] and members of the Select Committee on Indian Affairs for their cooperation and assistance. The chairman's statement makes it clear that *any high stakes gaming, including bingo, in Rhode Island will remain subject to the civil, criminal, and regulatory laws of our State.*

134 Cong.Rec. S12650 (daily ed. Sept. 15, 1988) (emphasis added).

 In considering petitioners' argument here, I note at the outset that the starting point for "statutory interpretation begins with the language of the statute itself." *Pennsylvania Department of Public Welfare v. Davenport,* 495 U.S. 552, 558, 110 S.Ct. 2126, 2130, 109 L.Ed.2d 588 (1990); *Securities Industry Ass'n v. Connolly,* 883 F.2d 1114, 1118 (1st Cir.1989), *cert. denied,* 495 U.S. 956, 110 S.Ct. 2559, 109 L.Ed.2d 742 (1990). And as the Tribe correctly notes, there is nothing in the Gaming Act that indicates that the Narragansetts or the settlement lands are not covered by its provisions. Although not cited by petitioners, the language referred to by Senator Pell was presumably contained in Section 23 of S.555. That section read:

> SEC. 23. Nothing in this Act may be construed as permitting gaming activities, *except to the extent permitted under the laws of the State of Rhode Island,* on lands acquired by the Narragansett Indian Tribe under the Rhode Island Indian Claims Settlement Act or on any lands held by, or on behalf of, such tribe. (emphasis added).

134 Cong.Rec. S12649 (daily ed. Sept. 15, 1988). I agree with the Tribe that had this section remained in the Act, "we would have a different situation." Narragansett Tribe's Memorandum In Opposition To The State's Motion For Preliminary Injunction at 20. But Section 23 was deleted from the bill on the floor of the Senate before it was passed and signed into law.

This leaves the two pieces of legislative history. The first item to consider is the passage from the Senate report on S. 555. One circuit court has stated that committee reports generally "represent the most persuasive indicia of Congressional intent (with the exception, of course, of language of the statute itself)." *Mills v. United States,* 713 F.2d 1249, 1252 (7th Cir.1983), *cert. denied,* 464 U.S. 1069, 104 S.Ct. 974, 79 L.Ed.2d 212 (1984). At the same time, another circuit court has cautioned that "[w]hile a committee report may ordinarily be used to interpret unclear language contained in a statute, a committee report cannot serve as an *independent statutory source having the force of law.*" *International Brotherhood of Electrical Workers, Local Union No. 474 v. National Labor Relations Board,* 814 F.2d 697, 712 (D.C.Cir.1987) (emphasis in original).

In the case at hand, petitioners are asking this court to interpret the Senate report as carrying the force of law where there is no textual support for their position. Even if I thought it was proper to accord such weight to the Senate report, which I do not, I find the key language inconclusive. It is unclear, for example, whether the Committee intended for the Gaming Act to have no applicability whatsoever to the Narragansett Tribe's lands.

The second fragment of legislative history is the Senate colloquy and deletion of Section 23. It is possible that Senator Pell, along with Senators Chafee and Inouye, thought that Section 23 would be redundant because they believed the 1978 Settlement Act already subjected the Tribe to Rhode Island criminal, civil and civil regulatory laws; including the State's gambling laws. But even if the Senators were correct in their interpretation of the jurisdictional reach of the Settlement Act before the passage of the Gaming Act, I believe, though my appellate brethren may not agree with me, that these stray comments alone cannot substitute for express statutory language excluding the Narragansetts or the settlement lands from the framework of the Gaming Act. Statements by individual legislators provide evidence of Congressional intent only when they are consistent with statutory language and other legislative history. *Brock v. Pierce County,* 476 U.S. 253, 263, 106 S.Ct. 1834, 1841, 90

L.Ed.2d 248 (1986); *Grove City College v. Bell,* 465 U.S. 555, 567, 104 S.Ct. 1211, 1218, 79 L.Ed.2d 516 (1984); *United States v. McGoff,* 831 F.2d 1071, 1090–91 (D.C.Cir. 1987). This is true even if one of the legislators is the sponsor of the legislation. *DeVargas v. Mason & Hanger–Silas Mason Co.,* 911 F.2d 1377, 1387 (10th Cir.1990), *cert. denied,* 498 U.S. 1074, 111 S.Ct. 799, 112 L.Ed.2d 860 (1991). *See also United States v. Tabacca,* 924 F.2d 906, 911 (9th Cir.1991). Thus, neither piece of legislative history can create an exception for the Narragansett Tribe or the settlement lands without some specific language in the Gaming Act itself.[9]

### C.

Petitioners' second and related argument why the Gaming Act does not apply to the settlement lands also hinges upon the 1978 settlement agreement between the Tribe, the State, the Town of Charlestown, and others, and the subsequent passage of the Settlement Act. They contend that "[t]he Gaming Act must be read … in light of the Tribe's agreement and consent and Congress' legislative action memorializing that agreement. As the Settlement Act is a more specific articulation of State and local jurisdiction over the Settlement Lands, the more general provisions of the Gaming Act relating to the regulation of gaming on tribal lands cannot alter the Tribe's prior agreement to be bound by State and local law or the prior federal law codifying that agreement." Memorandum In Support of Petitioners' Motion For Summary Judgment at 5–6. Petitioners' contention here relies upon the rule of statutory construction that when one statute deals with a subject in general terms, and another deals with a part of the same subject in a more detailed way, and the two cannot be reconciled, the latter statute will prevail.

*See Sutherland Stat. Const.* § 51.05 (5th ed. 1992).

I believe petitioners have reversed the characterization of the laws—that is, the Settlement Act is the *general* statute and the Gaming Act the *specific* statute. Thus, under the petitioners' own reasoning, the Gaming Act should prevail. But there is no need to go through this type of statutory exercise. As noted above, courts have held that the Gaming Act preempts over earlier federal laws giving states jurisdiction over Indian lands, and that states may now assert jurisdiction over Class III gaming under § 2710(d)(1) of the Gaming Act only through the Tribal–State compact process. *See United Keetoowah Band of Cherokee Indians, supra; Sycuan Band of Mission Indians, supra; Lac du Flambeau Band of Superior Chippewa Indians, supra.*

I recognize that § 1708 of the Settlement Act states that "the settlement lands shall be subject to the civil and criminal laws and jurisdiction of the State of Rhode Island." 25 U.S.C. § 1708. But even assuming *arguendo* that § 1708 of the Settlement Act granted the State and the Town of Charlestown jurisdiction over gambling activities on the settlement lands, that jurisdictional grant is preempted by the Gaming Act in the field of gaming. The State and Town of Charlestown continue to retain whatever jurisdiction they might have over the settlement lands— an issue that I do not address in this opinion. The Gaming Act simply prohibits the State or Town from exercising jurisdiction over Class III gaming activities under § 2710(d)(1) except through the Tribal–State compact process. It is this Tribal–State compact process that the Narragansett Tribe seeks to initiate at this time.[10]

**9.** In further support of my finding here, I note the general rule that "[w]here Congress includes limiting language in an earlier version of a bill but deletes it prior to enactment, it may be presumed that the limitation was not intended." *United States v. Sisseton–Wahpeton Sioux Tribe,* 897 F.2d 358, 362 n. 8 (8th Cir.1990) (quoting *Russello v. United States,* 464 U.S. 16, 23–24, 104 S.Ct. 296, 301, 78 L.Ed.2d 17 (1983)).

**10.** For the sake of clarity, I stress that the 1978 JMOU, as implemented by the 1978 Settlement Act, should not be confused with the Tribal–State compact process delineated in the Gaming Act. As discussed above, the Tribal–State compact process is the exclusive vehicle for state jurisdiction over Class III gaming under § 2710(d)(1) of the Gaming Act. While beyond the scope of this opinion, and not raised by the parties, I must note that it is possible that the State of Rhode Island, under the 1978 Settlement Act, retains some criminal jurisdiction to regulate Class III gaming activities not governed by § 2710(d)(1). *See* 18 U.S.C. § 1166(d).

**D.**

■ In a final attempt to situate the Tribe outside the ambit of the Gaming Act, petitioners argue that the settlement lands are not "Indian Lands" as defined by the Act. Section 2703(4) of the Gaming Act states that "Indian lands" means:

(A) all lands within the limits of any Indian reservation; and.

(B) any lands title to which is either held in trust by the United States for the benefit of any Indian tribe or individual or held by any Indian tribe or individual subject to restriction by the United States against alienation and over which an Indian tribe *exercises governmental power.* (emphasis added).

Petitioners argue that the Tribe does not exercise "governmental power" because jurisdiction over the settlement lands is exclusively reserved to the State under § 1708 of the Settlement Act. Further, they contend that the Tribe has acknowledged the authority of the state over the settlement lands in previous court proceedings. As a related argument, petitioners assert that the Tribe cannot satisfy § 2710(d)(3)(A) of the Gaming Act, which requires that an Indian tribe have "jurisdiction" over the lands targeted for Class III gaming.[11]

I do not find these arguments persuasive. The Tribe is federally acknowledged. 48 Fed.Reg. at 6177–78 (1983). This federal status enables the Tribe to "be eligible for services and benefits from the Federal Government available to other federally recognized tribes and entitled to the privileges and immunities available to other federally recognized tribes by virtue of their status as Indian tribes with a *government-to-government relationship to the United States* as well as

having the responsibilities and obligations of such tribes." 25 C.F.R. § 83.11(a) (emphasis added). In the wake of this federal designation, several United States agencies have recognized the Tribe as a sovereign power. In 1987, for example, the U.S. Department of Housing and Urban Development confirmed that the Tribe had properly established an Indian Housing Authority eligible to participate in Indian Housing Programs. In 1989, the U.S. Environmental Protection Agency confirmed that the Tribe met the criteria required for it to be treated as a state under § 106 of the Clean Water Act, 33 U.S.C. § 1256—a provision relating to federal grants for pollution control programs. According to the Tribe, it has also contracted with the Bureau of Indian Affairs and Indian Health Service to administer, manage and operate federal programs for the benefit of its members under the Indian Self–Determination and Educational Assistance Act, 25 U.S.C. § 450 *et seq.*

In addition, the First Circuit has recently affirmed a finding by this Court that the Tribe possesses common law sovereign immunity from suit. *Maynard v. Narragansett Indian Tribe,* 798 F.Supp. 94 (D.R.I.1992), *aff'd,* 984 F.2d 14 (1st Cir., January 27, 1993). This sovereign immunity grows out of the recognition that "[i]ndian tribes are 'domestic dependent nations,' which exercise inherent sovereign authority over their members and territories." *Oklahoma Tax Comm'n v. Citizen Band Potawatomi Indian Tribe,* 498 U.S. 505, 509, 111 S.Ct. 905, 909, 112 L.Ed.2d 1112 (1991) (quoting *Cherokee Nation v. Georgia,* 30 U.S. (5 Pet.) 1, 17, 8 L.Ed. 25 (1831)).

While all of this does not conclusively demonstrate that the Tribe "exercises govern-

---

**11.** Petitioners also halfheartedly suggest that the Tribe may not possess "powers of self-government"—one part of the Gaming Act's definition of "Indian Tribe." § 2703(5). Petitioners only support for this argument is that the Tribe has not affirmatively demonstrated that it has adopted a Constitution or otherwise complied with the provision of the Indian Reorganization Act of 1934, 25 U.S.C. § 461 *et seq.* This Court is unaware of any statutory or regulatory requirement that tribes have Constitutions to satisfy the "self-government" definition. Moreover, I find little merit in petitioners' argument given my

finding *infra* that the Tribe "exercises governmental power" under the Gaming Act.

In addition, petitioners claim in their original Memorandum of Law (at 13) that the settlement lands do not constitute a "reservation" under § 2703(4)(A) of the Gaming Act. They do not back up this contention with any support, and apparently concede the point in their subsequent Memorandum In Support Of Summary Judgment (at 14). I note that the Tribe's settlement lands were accepted into trust by the Bureau of Indian Affairs on behalf of the United States government on September 12, 1988.

mental power" or possesses "jurisdiction" under the Gaming Act, it points to substantial governmental authority on the part of the Tribe over its lands. Further, petitioners offer no case law or other support for the proposition that the State's or Town's jurisdiction under § 1708 of the Settlement Act—even if it includes civil regulatory jurisdiction—bars the Tribe from satisfying these requirements.

"[I]t is a settled principle of statutory construction that statutes passed for the benefit of dependent Indian tribes are to be liberally construed, with doubtful expressions being resolved in favor of the Indians." *Three Affiliated Tribes of Ft. Berthold Reservation v. Wold Engineering, P.C.*, 467 U.S. 138, 149, 104 S.Ct. 2267, 2275, 81 L.Ed.2d 113 (1984). In the present case, this presumption helps convince me that these two ambiguous terms must be construed in favor of the Tribe. Thus, I conclude that the Narragansett Tribe "exercises governmental power" and possesses "jurisdiction" over their lands, as those terms are used in the above-cited sections of the Gaming Act.

## IV.

The Gaming Act is the product of years of legislative negotiations to formulate a comprehensive scheme for regulating gaming on Indian lands. In enacting the Gaming Act, Congress sought to set in motion Indian gaming around the country within a carefully structured three-tiered gaming classification system. The dominant feature of the Gaming Act is the Tribal–State compact mechanism. This compact process was designed by Congress to balance the interests of states in regulating high stakes gambling and the interests of indian tribes in resisting state interference on their lands.

My ruling in this case is narrow. I hold only that the Gaming Act is applicable to the Narragansett Tribe's settlement lands. Thus, under § 2710(d)(3)(A) of the Act, the State of Rhode Island must now enter into good faith negotiations with the Narragansett Tribe for the purpose of forming a Class III Tribal–State compact. I decline to address the general applicability of state and local jurisdiction over the settlement lands,

having found no justiciable controversy with respect to this issue.

In accordance with my October 6, 1992 Order, the commencement of the 180–day period under § 2710(d)(7)(B)(i) of the Gaming Act shall begin as of the date of this opinion. At the end of 180 days, the Tribe may, if necessary, initiate a cause of action in this Court arising out of the failure of the State to enter into negotiations with the Tribe, or to conduct such negotiations in good faith. §§ 2710(d)(7)(A)(i) and (B)(i).

This ruling means only that the State must enter into compact negotiations with the Tribe. At least at this stage, I leave it to the parties to determine the scope of the compact negotiations, including what forms of, and under what conditions, Class III gaming will be allowed on the settlement lands.

SO ORDERED.